[No. A036028. First Dist., Div. Four. Jan. 29, 1988.]

MEL FONG et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and
Appellant.

**[Opinion certified for partial publication.\*]**

---

*Parts IIA and IIC are not ordered published, as they do not meet the standards for publication contained in rule 976(b) of the California Rules of Court.

---

COUNSEL

Glen A. DeRonde, John A. DeRonde, Jr., and DeRonde & DeRonde for Plaintiffs and Appellants.

Howard V. Golub, Robert L. Bordon, Pamela C. Christensen, Audrey D. Bojack and David W. Anderson for Defendant and Appellant.

---

OPINION

POCHÉ, J.—Defendant Pacific Gas and Electric Company (PG&E) appeals from a judgment in favor of plaintiffs Mel Fong, Ruth Fong, Robert Fong, Ivy Fong and Jim Fong[1] in this action for damages arising out of a fire in plaintiffs' garage alleged to have been caused by faulty electrical distribution lines owned by PG&E. The primary challenge on appeal is to the delivery of instructions on strict liability in tort due to defective electricity. We agree that under the facts of this case such a theory does not lie.

## I. THE EVIDENCE

Plaintiffs had a large rectangular garage (60 feet by 40 feet) on their farm in Fairfield. Originally it had been used as a commercial garage, but at the time of the fire it was a place for storage and repair of plaintiffs' vehicles. On January 26, 1984, the structure burned to the ground.

The garage received its electricity from electrical lines which were installed, owned and operated by PG&E. The lines attached at a "weatherhead" in the southeast corner of the building. Plaintiffs' theory was that PG&E's triplex service, which consists of three electrical wires braided together, lost its insulation because of faulty installation.[2] As a result the

---

[1] Jim Fong died prior to trial.

[2] Actually only two of the wires are covered with insulation and are energized. The third wire, known as a "neutral," is neither insulated nor energized.

wires were allowed to come into contact with each other which caused arcing of the electric current and heating of the wires. In turn, molten aluminum dropped onto the shingled roof of the garage causing it to catch fire. PG&E's theory was that the fire started inside the garage, possibly as the result of an ignited battery charger.

PG&E's wires led from an electric line on the public road to a "clearance pole" on plaintiffs' property about 50 feet from the garage. From the clearance pole the wires led to a vertical pipe, part of the weatherhead, on the southeast roof of the garage. The weatherhead consists of a vertical rigid steel conduit capped by a device called the "weatherhead service entrance," into which the customer's wires are inserted. Its function is to provide rigid support and protection of the wiring as it goes down into the building. The weatherhead, i.e., the conduit and the "service entrance," was installed, maintained and owned by plaintiffs. PG&E's lines connected to plaintiffs' wires between the clearance pole and the weatherhead.

From the point of connection with PG&E's wires, the customer's wires entered the weatherhead service entrance and descended in the vertical conduit to an electric meter (belonging to PG&E) on the side of the garage. From the electric meter, the wires entered the garage and ran through a fuse box and a subpanel where the circuit breakers were located. The wires ended at plugs in the garage.

The fire was first spotted by Bob Whobrey and Lynn Copabianco, tenants who rented a house near the garage. About 5 p.m., both Whobrey and Copabianco saw "a lot of flames" coming from the southeast corner of the garage. Copabianco testified that she and Whobrey walked to the southeast corner of the garage where she noticed that the electrical wires connected to the building "were sparking." Whobrey described the wires as "sparking and popping," a condition which continued until after the fire fighters arrived. In his opinion, the flames were "definitely outside" of the garage.

City of Fairfield Firefighters Larry Davis and Gary Jensen were the first firefighters on the scene. They each testified that at that time the electrical lines were intact; neither saw arcing or sparking on the lines. According to Davis, the fire was burning inside the southeast corner of the garage; there was no indication that the fire had burned through the walls or the roof. In fact he saw no evidence of a fire burning outside the garage.

PG&E's troubleman,[3] George Duncan, arrived at the fire about 6 p.m.; by that time, the garage was fully engulfed. Because the wires from the clear-

---

[3] The title is apt: a troubleman's job is to answer customer complaints, check on downed wires, car pole accidents, structure fires, etc., as well as doing "high voltage switching, clear-

ance pole to the garage had fallen, Duncan cut the still energized wires at the pole. He tested the voltage of the wires: it was normal on each wire. He also examined the wire from the pole to the part lying on the ground. The wire was in "good shape" down to the last two or three feet that was lying on the ground. On that portion he observed both arcing and melted insulation. There was no evidence that surrounding trees had rubbed on the wires.

Plaintiffs presented three experts. The first was Robert Parker, a building inspector for the City of Benicia and a licensed electrical contractor, who had investigated the electrical system about six weeks after the fire.[4] He examined the weatherhead and determined only the outside was burned. On PG&E's wires, he found evidence of arcing and burning and no insulation. Parker testified that arcing on the metal can cause the insulation to melt. Parker saw no malfunction in the circuit breaker or the fuses. However, he could not "rule out electrical appliances plugged in at the time of the fire as the cause of this fire."

Tariq Khalidi, an electrical engineer and president of Seneca Engineers, an electrical engineering consultant firm, also testified as an expert for plaintiffs. He saw evidence of arcing on PG&E's wires, but not on plaintiffs'. He testified that the insulation had been almost entirely burned off PG&E's wires, but not plaintiffs'. He found no damage or defects in the connections between PG&E's wiring and plaintiffs'. Khalidi stated that with proper insulation, when joined together, the wires should not cause an arc. Once arcing begins it will melt the insulation. He, too, found no evidence of arcing in the circuit breaker box or the fuse box. Each had only the damage one would expect from a fire.

Dan C. Christie also found evidence of arcing on the PG&E wires, but no evidence of arcing in the panel box or fuse box. In his view, the fire originated in the PG&E weatherhead where the lines lacked proper insulation.

## II. REVIEW

### A. *The Pleadings**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

ing lines for crews to work on, . . . do the turn-ons and turn-offs when people move . . . maintain the substations, keep the voltage regulation within the proper limits, and usually anything else anybody can think of."

[4] Parker had over 25 years of experience in the high voltage electrical systems field including 11 years in the military as a high voltage lineman.

* See footnote, *ante,* page 30.

## B.   *Strict Liability in Tort*

██   The law of strict liability in tort for defective products in this state derives from the well-known case of *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . . [T]he liability is not one governed by the law of contract warranties but by the law of strict liability in tort." (*Id.* at pp. 62-63; accord *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130 [104 Cal.Rptr. 433, 501 P.2d 1153]; cf. Rest.2d Torts, § 402A.) Placing an article on the market under the *Greenman* test is the functional equivalent of putting a product " *'in the stream of commerce'* " as used in the Restatement Second of Torts, section 402A. (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 254 [85 Cal.Rptr. 178, 466 P.2d 722], italics in original.)

██   It is now firmly settled that electricity can be a product within the meaning of *Greenman* and section 420A of the Restatement Second of Torts and therefore subject to principles of strict liability in appropriate cases. (*Pierce* v. *Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68, 83-84 [212 Cal.Rptr. 283, 60 A.L.R.4th 709] ; see also *Smith* v. *Home Light and Power Co.* (Colo. 1987) 734 P.2d 1051, 1054; *Ransome* v. *Wisconsin Elec. Power Co.* (1979) 87 Wisc.2d 605 [275 N.W.2d 641, 648]; *Houston Lighting & Power Co.* v. *Reynolds* (Tex.App. 1986) 712 S.W.2d 761, 766; *Elgin Airport Inn* v. *Commonwealth* (1980) 88 Ill.App.3d 477 [410 N.E.2d 620, 623-624]; *Petroski* v. *Northern Indiana Pub. Service Co.* (1976) 171 Ind.App. 14 [354 N.E.2d 736, 747]; *Schriner* v. *Pa. Power & Light Co.* (1985) 348 Pa.Super. 177 [501 A.2d 1128, 1133].)

The seminal case in California regarding strict liability in tort for defective electricity is *Pierce* v. *Pacific Gas & Electric Co., supra,* 166 Cal.App.3d 68. In *Pierce,* the plaintiff lost power in her home after an electrical transformer malfunctioned. PG&E attached a used transformer to the power lines as a replacement. On the third connection, however, the used transformer exploded, and "energized" the wiring of plaintiff's house with approximately 7,000 volts. Unaware, plaintiff attempted to turn off the valve of a leaking propane tank and received a severe shock.

On review of a nonsuit granted on plaintiff's cause of action for strict liability in tort for defective electricity the Court of Appeal reversed. In

doing so the court rejected PG&E's argument that the electricity it furnished was a service not a product: "Although we have found no California case which has considered the issue in the strict tort liability context, the courts of other states have had little trouble in concluding that electricity delivered to homes and businesses is a 'product.' [Citations.] As the Supreme Court of Wisconsin aptly put it, 'The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.' [Citation.]" (At p. 82, citing and quoting *Ransome* v. *Wisconsin Elec. Power Co., supra,* 275 N.W.2d at p. 643.) Thus the court in *Pierce* concluded that "PG & E, as a commercial supplier of electricity, is subject to strict liability in tort for personal injuries caused by *delivery of electricity at dangerously high voltage due to a defective transformer. . . .*" (*Pierce* v. *Pacific Gas & Electric Co., supra,* 166 Cal.App.3d at pp. 83-84, italics added.)

■ Here there was no evidence of a defect in the electricity itself. All agree that the voltage of the lines was normal. Where then is there a defective product?

In plaintiffs' view, it was the incoming power lines which were defective because they lacked adequate insulation. Plaintiffs contend that *Pierce* compels the application of strict liability because the electricity was in a form not intended by PG&E when it emerged from the power lines near the consumers' garage. We do not agree. Nothing in *Pierce* even hints that the court was interested in overturning what is settled law in this state and in other jurisdictions: strict liability in tort does not apply to defective electric transmission lines or defects anywhere along the distribution lines.

More akin to this case is *United Pacific Co.* v. *Southern Cal. Edison Co.* (1985) 163 Cal.App.3d 700 [209 Cal.Rptr. 819]. There, a major fire was caused when a runaway kite lodged on a power line causing two conductors to nearly engage. Their proximity caused the electric currents to arc, which in turn melted aluminum on the conductors which fell to the ground and ignited the fire. In affirming the trial court's ruling that strict liability in tort did not apply, the Court of Appeal reasoned: "high voltage electric transmission facilities are not placed in the stream of commerce, but, on the contrary, are retained in the ownership and control of the electricity supplier and used solely by it to transmit electricity to other facilities for reduction of voltage and ultimate delivery to meet the demands of consumers. The products liability doctrine does not require a transfer of ownership [citation] but it does require that a product be marketed, or in some manner be placed in the stream of commerce. Here that did not occur." (*Id.* at pp.

707-708; see also *Thibos* v. *Pacific Gas & Electric Co.* (1986) 187 Cal.App.3d 337, 340 [232 Cal.Rptr. 11] [strict liability does not attach to defective street light installed and maintained by PG&E].)

A perusal of cases outside of California demonstrates a consistent view that the presence of defects in power lines owned and operated by a public utility does not subject the utility to strict liability in tort. There are a number of reasons for nonliability. One view is that the lines carrying the electrical current are not packaging of the current and therefore are not part of the product being sold. Instead, the lines are merely a delivery system which remains owned by and under the control of the electric company. (*Genaust* v. *Illinois Power Company* (1976) 62 Ill.2d 456 [343 N.E.2d 465, 469-470, 82 A.L.R.3d 205]; accord *Smith* v. *Home Light and Power Co., supra,* 734 P.2d at p. 1056; *Cratsley* v. *Commonwealth Edison Company* (1976) 38 Ill.App.3d 55 [347 N.E.2d 496, 499]; *Farina* v. *Niagara Mohawk Power Corp.* (1981) 81 App.Div.2d 700 [438 N.Y.S.2d 645, 646].) Another view is that until the electricity is actually delivered to the home or the factory, it has neither been sold nor placed in the "stream of commerce." (*Petroski* v. *Northern Indiana Pub. Service Co., supra,* 354 N.E.2d at p. 747; accord *Schriner* v. *Pa. Power & Light Co., supra,* 501 A.2d at p. 1134; *Williams* v. *Detroit Edison Company* (1975) 63 Mich.App. 559 [234 N.W.2d 702, 707].) That is the view that *Pierce* took. (See 166 Cal.App.3d at p. 84.)

Also illustrative is *Cratsley* v. *Commonweath Edison Company, supra,* 347 N.E.2d 496. There a man was electrocuted when he came into contact with a fallen high voltage power line. In a subsequent suit against the electrical company it was alleged that the defendant was in the business of manufacturing, transmitting and selling electrical energy, including transmission wires and that the transmission wires utilized were not reasonably safe for their intended use because they were not sufficiently thick, strong, or durable. In concluding that plaintiffs had failed to state a cause of action, the reviewing court reasoned, "in the instant case the transmission wires remained under the control of defendant, and contrary to plaintiff's allegations, were not sold to any consumer. Moreover, plaintiff does not plead a defect in the electrical current itself, but rather that the weakness of the wire made it impossible for it to withstand the force of the amperes exerted upon it. We find that the trial court properly dismissed count four . . . for failure to state a cause of action." (*Id.* at p. 499.)

Similarly, in the case at hand the transmission wires were under PG&E's control and were neither manufactured by PG&E nor sold to plaintiffs. The claimed defect was not in the electrical current but in the insulation of the

wire itself. A cause of action for strict liability cannot lie against PG&E for this defect.

■ Finally we consider plaintiffs' contention that the electricity here was in the stream of commerce and subject to a strict liability analysis because of the proximity of the wires to the consumers' home.

Electricity has been deemed to enter the stream of commerce when it leaves the transmission lines and passes through the customer's meter. (*Williams* v. *Detroit Edison Company, supra,* 234 N.W.2d at p. 707.) In *Pierce* the court explained, "We emphasize that our holding is limited to cases where the electricity is actually in the 'stream of commerce,' and expected to be at marketable voltage. In most cases this will mean the electricity must be delivered to the customer's premises, to the point where it is metered, although the many variations in electrical systems prevent our drawing a 'bright line' at a particular point." (166 Cal.App.3d at p. 84, fn. omitted.) In a like manner the Pennsylvania Superior Court summed up: "In other words, while still in the distribution system, electricity is a service, not a product; electricity becomes a product, for purposes of strict liability, once it passes through the customer's meter and into the stream of commerce. [Citation.]" (*Schriner* v. *Pa. Power & Light Co., supra,* 501 A.2d at p. 1134.)

Thus, contrary to plaintiffs' protestations, electricity does not become a product once it is delivered to plaintiffs' premises, i.e., the moment the wires cross plaintiffs' property line.[7] Instead, the test is whether the electricity has been metered. By any accounting of plaintiffs' evidence here, the fire occurred before the electricity reached the meter. Thus the electricity, if defective, was still in the distribution line and not in the stream of commerce.

For each of these reasons, therefore, we find no evidence to warrant application against PG&E of strict liability in tort. The electricity was not defective at the point the fire allegedly occurred, the electricity had not left PG&E's control at the point the fire allegedly occurred and therefore there was no product in the stream of commerce. The jury's verdict must therefore be reversed.

---

[7] Indeed if one accepted plaintiffs' test of the point at which a product is in the stream of commerce, a manufacturer would be strictly liable when his delivery truck crashes into an object on the consumer's property. Such a notion must be rejected out of hand.

## C.   *The Nonsuit* *

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is reversed and the cause is remanded to the trial court with directions to enter judgment in favor of PG&E.

Anderson, P. J., and Sabraw, J., concurred.

A petition for a rehearing was denied February 25, 1988.

---

* See footnote, *ante*, page 30.