[No. B043903. Second Dist., Div. Three. July 11, 1991.]

ANTHONY MANCUSO, Plaintiff and Respondent, v.
SOUTHERN CALIFORNIA EDISON COMPANY, Defendant and
Appellant.

## COUNSEL

Chase, Rotchford, Drukker & Bogust, Darryl A. De Cuir and Clay Robbins III for Defendant and Appellant.

Hill, Farrer & Burrill, William M. Bitting, Dean E. Dennis and William A. White for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—The defendant and appellant Southern California Edison Company (Edison) appeals a judgment entered in favor of the plaintiff and respondent Anthony Mancuso following the trial court's summary adjudication of the issue of liability and a jury verdict as to damages. Plaintiff's damages arose from the destruction of his business by a fire caused by an excessive amount of electrical current conducted to plaintiff's premises through Edison's facilities. Although it is undisputed that the excessive electrical current was the result of a lightning strike upon Edison's facilities, the trial court determined that Edison was liable to plaintiff, as a matter of law, on a product liability theory. As we conclude that lightning generated electricity is not a "product" for purposes of strict liability, we hold that the trial court's determination was erroneous. We therefore reverse the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff owned and operated an upholstery and furniture shop in Torrance, California. He conducted his business in a wood building which measured approximately 30 feet by 30 feet and was routinely stocked with such items as cloth, wood materials, glue and cleaning solvents. Electrical service was supplied to plaintiff's building by Edison.

Adjacent to plaintiff's building was an Edison utility pole which supported 16-kilovolt (KV) primary electrical conductors and a transformer. Electrical service to plaintiff's building was supplied by secondary service conductors from the transformer to two meter panels located on plaintiff's premises. The transformer stepped down the 16-KV primary voltage generated by Edison to a service voltage for use by customers after passing through an Edison meter.[2] The facilities owned by Edison by which such service is provided include the primary conductors, utility pole and cross-arms, insulators, fuses, transformer, secondary service conductors and meter panels.

On April 27, 1984, the Torrance area experienced an electrical storm of unusual intensity. During the course of this storm, a severe lightning stroke hit the Edison facilities adjacent to plaintiff's business. Eyewitnesses described the stroke as hitting the Edison pole or transformer, causing the transformer to explode into flames. The lightning also generated electricity which, in seeking a path to ground, traversed the service conductors to plaintiff's building and caused sparks and flames to be emitted along the entire length of the service wires. When the lightning generated electricity reached plaintiff's building its extraordinarily high level of energy caused one of the meter panels on the premises to explode. The resulting fire on the premises was apparently caused by heated material from the explosion coming into contact with combustible items in plaintiff's shop. The fire totally destroyed the premises and its contents.

The record before us reflects that the Edison distribution system, as designed, contained excess voltage or lightning protection features, including the use of wooden poles, insulators and fuses. The transformer was grounded and rated to withstand a 95-KV impulse.[3] However, the facilities

---

[1]The parties are in substantial agreement as to the factual background.

[2]The service voltage used by Edison's customers does not exceed 120 volts, or 240 volts if measured phase to phase.

[3]It is apparently not disputed that the lightning generated electricity equaled or exceeded 95,000 volts. Indeed, one of Edison's expert witnesses expressed the opinion that the electricity conducted to plaintiff's premises may have been as high as 400,000 volts and up to 100,000 amperes.

immediately adjacent to plaintiff's premises were not constructed with any additional lightning arrester equipment. Edison makes its determination whether to install such additional equipment at any given location upon a cost benefit analysis. Historical data of electrical activity in a particular area is weighed against the cost of installing arresters. Another factor considered by Edison is that such installations involve additional equipment on a functioning electrical distribution system, thus increasing the risk of failure and customer service interruption. Edison regarded the area where plaintiff's business was located as involving low lightning activity.[4]

On July 30, 1984, plaintiff filed this action against Edison seeking damages for the property loss which he had sustained. In this first pleading plaintiff sought recovery on the theories of negligence and product liability. Subsequently, on April 26, 1988, the trial court permitted plaintiff to file a first amended complaint in which he added a third cause of action for breach of the implied warranty of fitness.

On December 12, 1988, the trial court heard and considered *in limine* motions filed by both plaintiff and Edison. Each party conceded in their moving papers that the fire had been caused by a lightning stroke on Edison's facilities. However, they took diametrically opposite positions on the consequences of this undisputed fact. Edison asked the court not to submit the case to the jury on a product liability theory. Edison argued that the evidence would establish that the electricity which caused the fire was not generated by Edison, but rather by a naturally caused stroke of lightning. Plaintiff responded that Edison should not be permitted to make this argument since it was, in effect, the assertion of the defense of "act of God" which, under the facts of this case, had no application. Plaintiff's position, concurred in by the trial court, was that the "act of God" defense cannot be raised if the particular natural event was foreseeable.

The trial court agreed with plaintiff on both points. It denied Edison's motion and held that plaintiff could proceed on a product liability theory. It further ruled that since Edison had not raised an issue of fact as to whether a lightning strike was foreseeable, then such an event could not be the intervening superseding cause required to establish an "act of God" defense.

Based upon these rulings, plaintiff filed a motion for summary adjudication of the issue of liability on the product liability claims contained in the

---

[4]Expert testimony presented to the trial court reflected that the area had an isokeraunic rating of 1 or 2, indicating the number of days of natural electrical activity per year. Fire department employees who investigated plaintiff's fire stated that they had never previously seen a fire caused by lightning in the Torrance area.

second and third causes of action of the first amended complaint. On January 11, 1989, the court granted the motion, thus holding that Edison was liable to plaintiff, as a matter of law, for the damages which he had sustained.[5] The court then continued the matter for a jury trial on that issue of damages.[6] On May 24, 1989, the jury returned a special verdict awarding damages to plaintiff in the sum of $100,295, to which $9,408.90 in prejudgment interest was added. Judgment was entered on December 6, 1989, and Edison filed a timely appeal.[7]

---

[5]On January 11, 1989, the court summarily adjudicated 17 "facts," concluding that 6 were undisputed and 11 were disputed but raised no issue of material fact. The court's order states in pertinent part:

"1.    The following facts were undisputed: [¶] *Fact No. 2*. The amount of voltage which [plaintiff] received at his meter box exceeded the capacity of the meter. [¶] *Fact No. 11*: [Edison] owned the electric meter on [plaintiff's] premises. [¶] *Fact No. 12*: When [plaintiff] occupied the premises at 3675 Newton in the City of Torrance, he purchased his electricity from [Edison]. [¶] *Fact No. 14*: When [plaintiff] occupied the premises at 3675 Newton in the City of Torrance, [Edison] knew the particular purpose for which electricity was required. [¶] *Fact No. 16*: [Plaintiff] has no knowledge or expertise in electrical engineering. [¶] *Fact No. 17*: At no time did [Edison] provide [plaintiff] with a conspicuous written exclusion of all implied warranties of fitness of electricity for the purpose for which he was using it in his shop.

"2.    The following facts were disputed but raised no issue of material fact: [¶] *Fact No. 1*: [Edison] sold defective electricity to [plaintiff]. [¶] *Fact No. 3*: The excess voltage of electricity which [Edison] delivered to [plaintiff] at his meter box caused the fire on April 27, 1984 at 3675 Newton Street, Torrance, California. [¶] *Fact No. 4*: The amount of electrical current which [plaintiff] received from [Edison] at his meter box was in the form of such high levels of current and voltage that the meter and electrical equipment there failed to perform as safely as an ordinary consumer could expect upon its receipt. [¶] *Fact No. 5*: The electricity which [Edison] delivered to [plaintiff] at its meter box was defective by virtue of its unsafe and excessive amount of current and voltage. [¶] *Fact No. 6*: [Edison] sold and delivered electricity to [plaintiff] which was defective due to the unsafe and excessive amount of current and voltage which was delivered. [¶] *Fact No. 7*: The excessive and unsafe amount of electricity delivered to [plaintiff's] meter box caused arcing and sparking in [plaintiff's] premises which resulted in a fire therein. [¶] *Fact No. 8*: The excessive electrical current which [Edison] delivered to [plaintiff's] meter box caused an electrical overload and blew the meter box off the wall. [¶] *Fact No. 9*: The defective electricity which [Edison] sold to [plaintiff] caused a fire at [plaintiff's] electrical meter which spread, destroying [plaintiff's] shop. [¶] *Fact No. 10*: The amount of electrical current and voltage which was ultimately delivered by [Edison] to [plaintiff's] premises was approximately 95,000 volts and 10 to 20,000 amps. [¶] *Fact No. 13*: When [plaintiff] occupied the premises at 3675 Newton in the City of Torrance, [Edison] regularly entered the premises to inspect the electrical meter on the premises. [¶] *Fact No. 15*: [Plaintiff] relied upon the skill and expertise of [Edison] in matters concerning the delivery of electrical current to the meter at the premises to provide him with a marketable voltage for use in his shop."

[6]Counsel advised us at oral argument that following the court's summary determination of Edison's liability on a product liability theory, plaintiff dismissed the negligence count of his first amended complaint. This permitted the trial court to limit the work of the jury, which was thereafter impaneled, to a consideration of the damages to be awarded to plaintiff.

[7]Apparently out of an abundance of caution, Edison filed its notice of appeal on July 21, 1989, within 60 days of the rendition of the jury's special verdict on May 24, 1989, but over

## Contentions on Appeal

Essentially, Edison asserts four principal arguments:[8]

1.   Strict product liability is not a proper theory of recovery to be applied against a regulated public utility;

2.   The distribution of electricity by a public utility is a service, not a sale of a product, and therefore a product liability theory is inappropriate;

3.   The electricity conducted through Edison's facilities and which caused plaintiff's fire and damage was not electricity which had been generated and sold to plaintiff by Edison; therefore there was no basis for a strict liability claim based on the sale of a defective product;

4.   The lightning strike which caused the fire was an "act of God" for which Edison is not responsible.

## Discussion

The trial court summarily determined that Edison was liable, as a matter of law, for delivering to plaintiff a defective product: electricity in an excessive voltage.[9] As it is undisputed that such excessive voltage was caused solely by a natural lightning strike, we need only determine whether such circumstance will support imposition of damages against a public utility not charged with fault or otherwise causing plaintiff's damage.[10]
This is a question of law as to which we conduct an independent review. "We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. [Citation.]" (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

---

6 months prior to the actual entry of judgment. The parties have agreed that we should, and we will, regard this premature notice as timely. (Cal. Rules of Court, rule 2(c).)

[8]Edison raises no issue here with respect to the question of damages or the jury's determination thereof. The dispute on appeal is confined to the trial court's summary determination of liability.

[9]The court's order of May 10, 1989 (which formalized its ruling of January 11, 1989) stated that its "rulings included the determination that, for the purposes of this case, electricity, not lightning, is the product in question and that if plaintiff received more electricity than he bargained for, even if precipitated by lightning, defendant is liable for the damage caused thereby."

[10]Plaintiff's negligence claim might well have properly raised issues regarding possible fault-based liability on the part of Edison. For example, a claim might have been raised as to whether Edison had unreasonably failed to install adequate lightning arrester equipment which might have prevented or reduced plaintiff's damages. Further, plaintiff might have asserted that Edison so negligently installed or maintained its facilities that the excess voltage generated by the lightning stroke was permitted to reach plaintiff's shop. However, in view of the dismissal of the negligence claim none of those possible bases for Edison's liability are before us.

Edison's liability is premised entirely upon a theory of strict product liability. ▆▆ This theory was thoroughly reviewed in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. Quoting from *Greenman*, the court in *Fong* v. *Pacific Gas & Electric Co.* (1988) 199 Cal.App.3d 30 [245 Cal.Rptr. 436] stated: " 'A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being . . . . [T]he liability is not one governed by the law of contract warranties but by the law of strict liability in tort.' [*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57,] at pp. 62-63; accord *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130 . . . ; cf. Rest.2d Torts, § 402A.) Placing an article on the market under the *Greenman* test is the functional equivalent of putting a product ' *"in the stream of commerce"* ' as used in the Restatement Second of Torts, section 402A. (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 254 . . . , italics in original.)" (*Fong* v. *Pacific Gas & Electric Co., supra,* 199 Cal.App.3d 30, 35.)[11]

We reject Edison's arguments that (1) a regulated public utility should not be subject to product liability claims and (2) the distribution of electricity is only a service, not the sale of a product. However, we find merit in Edison's claim that lightning-generated electricity is not a product generated or sold by it and thus cannot be relied upon by plaintiff as a basis for imposing strict liability on Edison. Further, we believe that the trial court erroneously barred Edison's "act of God" defense, which, in effect, was a denial that Edison proximately caused plaintiff's damages. At the very least, material issues of fact existed with respect to such defense.

While no California case has dealt directly with these issues in the factual context presented to us, there are three recent cases which provide us with considerable guidance. Because they are so important to the disposition of this matter, it is appropriate to have them before us as we begin.

In *United Pacific Co.* v. *Southern Cal. Edison Co.* (1985) 163 Cal.App.3d 700 [209 Cal.Rptr. 819] (*United Pacific*), the court had before it the very substantial damage claims which arose from the destruction by fire of approximately 200 homes in the Sycamore Canyon area of Santa Barbara on July 26, 1977. The fire occurred after a kite had become entangled in electrical conductors and pulled them close enough together to cause an electrical arc which in turn resulted in molten aluminum falling into dry

---

[11]Subsequently, this theory of liability was expanded to include physical damage to property. (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 19 [45 Cal.Rptr. 17, 403 P.2d 145]; *Sacramento Regional Transit Dist.* v. *Grumman Flxible* (1984) 158 Cal.App.3d 289, 293 [204 Cal.Rptr. 736].)

brush setting it ablaze. The court concluded that imposition of strict product liability upon the defendant electrical utility was inappropriate for two reasons: First, the operation of electrical transmission lines and facilities did not involve the packaging or sale of a product and such facilities at all times remained the property and under the control of the utility. Second, when examined in light of the traditional policy reasons for the imposition of product liability (i.e., spreading the risk of loss among all consumers, creating an economic incentive to improve the "product" and easing the plaintiff's burden of proving liability in difficult and complex cases), there was little rationale for imposing such liability on a regulated public utility.[12]

In *Pierce* v. *Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68 [212 Cal.Rptr. 283, 60 A.L.R.4th 709] (*Pierce*), plaintiff homeowner received an injury causing electrical shock when, due to the installation of a defective transformer, a dangerously high voltage (over 7,000 volts) was delivered to her home. The court held that electricity could be considered a consumable "product" rather than a service for strict product liability purposes and that the defendant utility, as a commercial supplier of electricity, was subject to strict liability in tort for personal injuries caused by the delivery of electricity at dangerously high voltage due to a defective transformer. However, the court expressly limited its holding to cases where electricity is actually in the "stream of commerce" and is expected by the consumer to be at marketable voltage.

Finally, in *Fong* v. *Pacific Gas & Electric Co., supra,* 199 Cal.App.3d 30 (*Fong*), plaintiff's garage was destroyed by fire when the defendant utility's transmission lines arced due to faulty insulation and dropped molten aluminum onto the garage's shingled roof. The court held that the defendant could not be strictly liable for plaintiff's loss. Such a theory, the court said, had no application to defective electrical transmission lines or other defects in the utility's distribution system, as such facilities are not placed in the stream of commerce or sold to the consumer and therefore are not a "product." The court specifically held that electricity does not enter the stream of commerce and become a product until the point at which it passes through the customer's meter.

With these cases as predicate, we now turn to the four arguments raised by Edison.

---

[12]As we point out below, we reject this second ground for refusing to permit a product liability theory to be asserted against a public utility.

### 1. *There Is No Policy Reason Why a Commercial Seller of Electricity Cannot Be Held Strictly Liable in Tort for Sale of a Defective "Product"*

■ We do not agree with *United Pacific*'s conclusion that a public utility's liability to its customers must be limited to negligence or other fault based theories. The cases have generally held that there are three principal policy grounds for the application of the doctrine of strict product liability: "(1) as a short cut to liability where negligence is present but difficult to prove, (2) as an economic incentive to improved product safety [which induces] the reallocation of resources toward safer products and [(3)] to spread the risk of loss among all who use the product. [Citation.]" (*McDonald* v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866, 874 [133 Cal.Rptr. 444].) An evaluation of these policies in the context of a product liability claim against a public utility does not cause us to reach a result different than that which we would reach with respect to any other commercial business.

#### a. *Proof of Liability*

Proof of negligence in an action arising from the delivery of electricity containing an excessive voltage will often require "a plaintiff to present to a jury evidence of the inner workings of an electrical power system of vast and complex proportions. The technical operation of such systems and of electricity itself is far beyond the knowledge of the average juror. The expert witnesses who can explain such systems to the jury are concentrated within the industry itself and may be reluctant to serve as expert witnesses [on behalf of plaintiffs]. Moreover, [the utility] is in a much better position than a consumer-plaintiff to diagnose—and ultimately to correct—the failures which inevitably occur in systems of such magnitude." (*Pierce, supra,* 166 Cal.App.3d at p. 83.)

#### b. *Economic Incentive to Safer Product Development*

The imposition of strict product liability upon a public utility will have the same impact as it does on other businesses. It will create an incentive to develop safer products and to take steps to avoid accidents. We perceive of no reason why the fact that Edison is a publicly regulated utility should in any way lessen such incentive or embarrass Edison's ability to respond to it. Certainly, Edison has not called our attention to any statutory provision, regulation or administrative order which restricts or limits Edison in the development of safer products or the practice of accident prevention. Moreover, as its rates are limited to "a reasonable return" and its costs and

expenses subject to review, it has every incentive to take whatever steps it can to minimize legal expenses and reduce its exposure to damage awards.

### c. *Opportunity to Spread the Risk*

Edison is a private profit-generating business which owns a publicly protected monopoly in its particular service area. While it is true that, as a public utility, it is limited to a reasonable return on its investment and its claimed costs and expenses are subject to periodic review and adjustment by the Public Utilities Commission (PUC), it does not follow that the costs of personal injuries or property damage should not be borne by Edison as part of the cost of doing business which it must justify to the PUC. That the PUC might limit the timing of or the extent to which Edison could pass product liability damages along to its customers does not justify the conclusion that Edison should not suffer such liability. The alternative is to "ask the unfortunate but inevitable victims selected (literally) by accident to bear the burden unaided." (*Pierce, supra,* 166 Cal.App.3d at p. 83.) That would be an intolerable result, particularly in light of the obvious fact that a utility's customers have no choice in the matter. They must either accept a particular utility's essential service or product or do without.

Finally, Edison's reliance upon pre-*Greenman* authorities[13] for the proposition that liability of power companies can only be based upon evidence of a failure to exercise due care is unavailing. These cases, with one exception, all antedate California's recognition of the product liability doctrine and are inapposite. ▉▉▉▉ Under modern California law, strict product liability is imposed on a power company not because it is engaged in an ultrahazardous *activity* (which it is not, [*McKenzie* v. *Pacific Gas & Elec. Co.* (1962) 200 Cal.App.2d 731, 736 (19 Cal.Rptr. 628),] disapproved on another point in *DiMare* v. *Cresci* (1962) 58 Cal.2d 292, 299 (23 Cal.Rptr. 772, 373 P.2d 860)]), but because it has *sold and delivered* a defective product to a customer which has resulted in injury or damage.[14]

---

[13]See, e.g., *Polk* v. *City of Los Angeles* (1945) 26 Cal.2d 519, 526 [159 P.2d 931]; *Minter* v. *San Diego Consol. Gas etc. Co.* (1919) 180 Cal. 723, 729-730 [182 P. 749]; *Scally* v. *Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806, 815-816 [100 Cal.Rptr. 501]; *Perrine* v. *Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 449 [9 Cal.Rptr. 45]; *Lozano* v. *Pacific Gas & Elec. Co.* (1945) 70 Cal.App.2d 415, 423 [161 P.2d 74]; *Sweatman* v. *Los Angeles Gas & Elec. Corp.* (1929) 101 Cal.App. 318, 322 [281 P. 677].

[14]Edison argues that since a *publicly held* utility, whose liability is limited by the Tort Claims Act, may not be exposed to strict product liability (*Tolan* v. *State of California* ex rel. *Dept. of Transportation* (1979) 100 Cal.App.3d 980, 986-987 [161 Cal.Rptr. 307]), it would be an anomalous result to impose such a burden on a private utility. However, we see no such anomaly. The potential disparate treatment of which Edison complains is in reality no greater a burden than is faced by any private concern engaged in an activity also carried on by a

### 2. *The Distribution of Electricity by a Public Utility Involves the Sale of a Product*

We also reject Edison's claim that electricity is solely service and not a product. This issue was put to rest in California by *Pierce*, where the court noted, "Over 20 years ago the California Court of Appeal recognized that 'Electricity is a commodity which, like other goods, can be manufactured, transported and sold.' (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 819 . . . .) Although we have found no California case which has considered the issue in the strict tort liability context, the courts of other states have had little trouble in concluding that electricity delivered to homes and businesses is a 'product.' [Citations.] As the Supreme Court of Wisconsin aptly put it, 'The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.' (*Ransome* v. *Wisconsin Elec. Power Co.* [(1979) 87 Wis.2d 605] 275 N.W.2d [641] at p. 643.)" (*Pierce, supra,* 166 Cal.App.3d at pp. 81-82.) Thus, electricity is "a product within the meaning of *Greenman* and section 420A of the Restatement Second of Torts and therefore subject to principles of strict liability in appropriate cases. [Citations.]" (*Fong, supra,* 199 Cal.App.3d at p. 35.)

However, the *Pierce* court was at pains to limit the scope of its novel conclusions. "We emphasize that our holding is limited to cases where the electricity is actually in the 'stream of commerce,' and expected to be at marketable voltage. In most cases this will mean the electricity must be delivered to the customer's premises, to the point where it is metered, although the many variations in electrical systems prevent our drawing a 'bright line' at a particular point." (*Pierce, supra,* 166 Cal.App.3d at p. 84, fn. omitted.)

The court in *Fong*, however, was more specific. In rejecting the claim of strict liability asserted against the electrical utility, the court, relying on *Pierce* and several out-of-state cases, concluded that, "Electricity has been deemed to enter the stream of commerce when it leaves the transmission lines and passes through the customer's meter. [Citation.] . . . 'In other words, while still in the distribution system, electricity is a service, not a product; electricity becomes a product, for purposes of strict liability, once it passes through the customer's meter and into the stream of commerce. [Citation.]' (*Schriner* v. *Pa. Power & Light Co.* [1985] 501 A.2d 1128, 1134.) [¶] [E]lectricity does not become a product once it is delivered to[plaintiff's]

---

public entity (e.g., the delivery of medical services, hospital care, pharmaceuticals, etc.). The liability of public entities has always been more limited and circumscribed than that of private entities or individuals. That such a circumstance is present here cannot justify the insulation of Edison from the consequences of culpable conduct.

premises, i.e., the moment the wires cross [plaintiff's] property line. *Instead, the test is whether the electricity has been metered.*" (*Fong, supra,* 199 Cal.App.3d at p. 38, fn. omitted, italics added.)

Electricity which has passed through the consumer's meter has been sold and delivered. It is in the stream of commerce. It has been marketed. Such a transaction constitutes the sale of a product and, if that product be defective and causes damage to the consumer, will support a cause of action based on the doctrine of strict product liability. (See *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 429-430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) This conclusion, which makes critical the market or sale transaction process, is relevant to the next issue we consider: whether *lightning-generated* electricity is also a product so as to justify imposition of strict liability upon Edison simply because it was conducted to plaintiff's premises by Edison's facilities.

### 3. *Lightning-generated Electricity Is Not a Product Which Is the Subject of a Sale or Market Transaction Between a Public Utility and a Consumer*

■ By limiting the basis of his claim to a product liability theory, plaintiff has burdened himself with the requirement that he establish that a "product" was sold and delivered to him by Edison which proved to be defective and thereby caused him damage. Thus, this is not a case where liability is asserted because of some negligent failure on the part of Edison to properly design, construct or maintain its distribution facilities so as to prevent an excessive or dangerously high voltage from reaching and passing into plaintiff's home or business.

The conclusion that lightning-generated electricity cannot be a product flows from the fact that it has not been marketed nor placed in the "stream of commerce" by any act of Edison. As the court noted in *Pierce,* such electricity is not a marketed product at all. All the utility has done was to provide "a connecting medium through which a force of nature enters the consumer's home and causes injury." (*Pierce, supra,* 166 Cal.App.3d at p. 84, fn. 10.)

Plaintiff's arguments make it clear that his real position is that Edison permitted the lightning to travel through its facilities into his furniture shop thereby causing the damages for which he seeks recovery. Thus, what plaintiff's case really rests upon is a defect not in the product which was sold to him (i.e., electricity generated by Edison), but rather a defect in the transmission and distribution facilities owned by Edison which permitted

nongenerated electricity to reach and damage plaintiff's property.[15] While such a factual circumstance might well support a claim based upon negligence, it cannot support a claim founded on strict product liability *where the excessive voltage is not the electricity generated for sale and delivery by Edison.*[16] "[H]igh voltage electric transmission facilities are not placed in the stream of commerce, but, on the contrary, are retained in the ownership and control of the electricity supplier and used solely by it to transmit electricity to other facilities for reduction of voltage and ultimate delivery to meet the demands of consumers. The products liability doctrine does not require a transfer of ownership [citation] but it does require that a product be marketed, or in some manner be placed in the stream of commerce." (*United Pacific Co., supra,* 163 Cal.App.3d at pp. 707-708.)

Defects in the transmission and delivery facilities of a power company will not result in a basis for strict product liability in the absence of the delivery of generated electricity which is itself in a defective condition (e.g., excessive voltage). As the court in *Fong* commented, "A perusal of cases outside of California demonstrates a consistent view that the presence of defects in power lines owned and operated by a public utility does not subject the utility to strict liability in tort . . . . [T]he lines carrying the

[15]That this is plaintiff's position is underscored by his heavy reliance upon *Ransome* v. *Wisconsin Elec. Power Co.* (1979) 87 Wis.2d 605 [275 N.W.2d 641]. In that case, the plaintiff's home was damaged by a fire caused by the delivery of an excessive amount of electricity. A lightning strike four days prior to the fire had damaged a nearby transformer which in turn later resulted in the delivery of the excess voltage to plaintiff's home. While the court did not expressly discuss the point, it is apparent that the fact that the condition of the utility's own transformer caused the delivery of the excessive voltage was critical to the finding of liability. The court's reliance upon this circumstance was obvious from its review of the law applicable to the so-called "act of God" defense. Such a defense is denied whenever some negligent or wrongful act combines with a natural event to cause damage to another. In *Ransome,* the utility's unstated negligent or wrongful act was the failure to discover and repair the damaged transformer in a timely fashion. Contrary to the facts before us, the electricity delivered in *Ransome* was the electricity generated by the utility and which it intended to sell and deliver to the plaintiff consumer. It was delivered in a defective condition due to the defective transformer, a circumstance which the trier of fact was free to conclude could have been prevented by the utility's timely inspection and remedial action. In other words, the risk of a defective transformer was one to be borne by the utility not the customer irrespective of the cause of such defect. Thus, the *foreseeability* of (1) lightning strikes, (2) damage to the utility's equipment which can result and (3) consequent damage to the consuming public were sufficient to bar this defense.

Plaintiff argues that this case is not significantly different from *Ransome.* Here, lightning also damaged a transformer and uncontrolled electricity surged through and destroyed plaintiff's meter causing damage. Plaintiff insists that the difference is only one of timing and degree. However, as we see it, that difference is critical. To ignore it is to conclude that Edison is an insurer. This we will not do.

[16]However, as our earlier discussion suggests, the delivery of "defective" electricity (i.e., in a dangerously excessive voltage) which was generated for sale by Edison would be sufficient to support a cause of action based on strict product liability.

electrical current are not [the] packaging of the current and therefore are not part of the product being sold. Instead, the lines are merely a delivery system which remains owned by and under the control of the electric company. [Citations.]" (*Fong, supra*, 199 Cal.App.3d at p. 37.)

We conclude that, on the undisputed facts before us, the electricity which caused plaintiff's damage was generated not by Edison but by a lightning strike. It was not a product marketed by Edison. Thus, Edison can have no liability to plaintiff under the doctrine of strict product liability. The trial court therefore erred in granting plaintiff summary adjudication of that issue.

### 4. *An Issue of Fact Exists With Respect to Proximate Cause*

The trial court denied Edison the opportunity to present any evidence on what the parties characterize as the "act of God" defense. The court reasoned that since lightning is foreseeable, such a defense was unavailable. However, what Edison sought to prove was that no act or omission on its part *caused* plaintiff's damages.[17] This argument is, of course, simply a logical extension of Edison's contention that plaintiff was not damaged by a product generated and sold by it. But it also has relevance to plaintiff's negligence claim. In view of our disposition of this matter, we discuss the issue for the guidance of the trial court.

The expert testimonial evidence presented by Edison, if believed, would have supported a finding that the lightning stroke was so powerful that it would have caused plaintiff's damages irrespective of Edison's ability to anticipate an electrical storm or to install lightning arrester gear. In other words, no act or omission of Edison's was the proximate cause of plaintiff's damage. On that point, the declarations and deposition testimony presented by Edison in opposition to plaintiff's summary adjudication motion clearly raised triable issues of material fact.

This case perhaps presents a classic example of the overlap which exists between an "act of God" defense and the issue of causation.[18] The defense that an event was an "act of God" exists and may be asserted in

---

[17]The issue of causation is, of course, relevant to any determination of liability under the doctrine of product liability. (*Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d at p. 62.)

[18]Indeed, it has been suggested that the defenses of unavoidable accident and (implicitly) "act of God" have no place in modern pleading and practice as they are, in reality, nothing more than the denial by a defendant of culpable conduct proximately causing a plaintiff's injury or damage. (See *Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652, 658-660 [320 P.2d 500, 65 A.L.R.2d 1]; *Clarke* v. *Michals* (1970) 4 Cal.App.3d 364, 371 [84 Cal.Rptr. 507].)

those limited cases where an *unanticipated* natural occurrence is the *sole* cause of a plaintiff's injury or damage. The natural event must be "so unusual in its proportions that it could not be anticipated by a defendant." (*Clarke* v. *Michals, supra,* 4 Cal.App.3d at p. 370.) However, it is not enough that the event merely be unforeseeable. "[T]he exculpatory rule applies *only* when human agency does not participate in proximately causing the harm. If defendant's negligence combines with an 'act of God' to cause injury, liability will result [citations]." (*Dufour* v. *Henry J. Kaiser Co.* (1963) 215 Cal.App.2d 26, 29 [29 Cal.Rptr. 871], italics added.) In other words, if culpable conduct on the part of the defendant was *a* proximate cause, the defense is of no avail.

As applied to the facts of this case, it would appear that the rule requires a showing that the lightning, or at least its particular intensity, was so unusual that neither it, nor the harm it caused, could have reasonably been anticipated. (See *Pappert* v. *San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 210-211 [186 Cal.Rptr. 847].) Such a requirement serves a pragmatic function. Presumably, if Edison could have foreseen the lightning strike, and the damage to plaintiff which could reasonably be expected, it could have taken steps to have prevented or mitigated that damage. Indeed, the duty of reasonable care which a public utility owes to its consumers would have required such action. However, this would only be true if, in fact, there was *anything* Edison reasonably could have done to prevent or lessen the harm to plaintiff.

In barring Edison from offering expert evidence of its own impotency on the ground that electrical storms are foreseeable, the trial court missed the point. Where admittedly an act of nature was *a* cause of harm, it is not enough to simply rely upon the label of "foreseeability." Implicit in that term is the conclusion that the natural event could have been anticipated or "prepared for" if only defendant had acted reasonably. However, if the consequences of the natural event, no matter how foreseeable, could not have been prevented or mitigated then clearly the defendant cannot be liable. In such event, there is no proximate causation.

Plaintiff contends that Edison's agency did contribute to his damages. He argues that it was Edison's facilities through which the lightning stroke entered plaintiff's building. As plaintiff puts it, "But for [Edison's] intervention [by erecting utility poles and transmission lines that redirect lightning strikes], that lightning would have struck somewhere else." What plaintiff (and the trial court in agreeing with him) overlooked was that Edison's act or agency, which allegedly contributed to plaintiff's damages, must necessarily consist of negligent or wrongful conduct. The mere construction and installation of transmission and delivery facilities in a reasonable and proper

manner, and in the ordinary course of business, would not constitute culpable conduct.

Thus, it was error for the trial court to summarily dismiss Edison's defensive claim merely because electrical storms are foreseeable. Such ruling deprived Edison of the opportunity to dispute the issue of whether or not any act or omission on its part was a proximate cause of plaintiff's damage.

## CONCLUSION

In summary, we conclude that while a public utility may be held liable under the doctrine of strict product liability and that the sale and delivery of electricity is the sale and delivery of a "product" for the purpose of such liability, there is no basis for imposing it here. The excessive voltage which reached plaintiff's premises was generated not by Edison, but by a stroke of lightning, a natural event. Thus, no product marketed by Edison was sold or delivered to plaintiff which could form the basis for strict product liability.

That is not to say, however, that some negligent act or omission on the part of Edison may not have contributed to the destructive delivery of such lightning generated electricity. If that be so, it was the result of a defect in the transmission facilities of Edison, not in the product itself. Such a circumstance would support a claim for negligence; but, as already noted, that claim was dismissed by plaintiff and is not now before the court. However, the circumstances of such dismissal are relevant to a just disposition of this matter. After the trial judge had determined the issue of liability in plaintiff's favor, plaintiff could hardly be expected to have insisted upon utilizing a significant additional amount of the court's time in order to prove an additional theory of liability.[19] As it appears very probable that plaintiff only dismissed this claim in reliance upon the court's summary determination of his strict product liability claim, it is both fair and appropriate that he be given the opportunity, upon remand, to prove liability based upon negligence. Of course, in such event, Edison shall also be entitled to attempt to demonstrate that its acts or omissions, if any, were not the proximate cause of plaintiff's damage and, if appropriate, that plaintiff's negligence contributed to his injury.

---

[19]This is especially true here. We take judicial notice of the fact that the trial judge in this matter is one of those assigned to the individual calendar "fast track" program in the Los Angeles Superior Court. Given the time pressures and constraints prevalent in such courts, plaintiff's request to present an apparently unnecessary negligence case to a jury would not have been well received.

In the event that Edison is found to be liable to plaintiff there is no need for the court to retry the damage question. That issue has already been resolved by the original jury verdict. To the extent the trier of fact determines that there is comparative fault on the part of plaintiff, the trial court can modify the damage award in accordance with that determination.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to vacate its orders of January 11 and May 10, 1989, granting summary adjudication of certain "facts" and to enter instead an order granting summary adjudication in favor of Edison as to the issue of liability on the second and third causes of action of plaintiff's first amended complaint.[20] ▇▇▇ ■■ The trial court is further directed to reinstate plaintiff's first cause of action for negligence and to conduct further proceedings thereon consistent with the views expressed herein.

In the event that it is determined Edison is liable to plaintiff, the court shall enter a judgment in favor of plaintiff for the amount of damages previously awarded (subject, of course, to any adjustment which might be required to reflect any comparative negligence found to exist on the part of plaintiff) with an appropriate modification of the amount of prejudgment interest. If Edison is found not to be liable for plaintiff's damage, the court shall enter judgment in its favor.

Edison shall recover its costs on appeal.

Klein, P. J., and Danielson, J., concurred.

---

[20]We necessarily dispose of both of plaintiff's product liability theories. His third cause of action is based upon implied warranty. To the extent that we have concluded that the lightning generated electricity was not a "product" for purposes of strict liability in tort, we would also conclude that it is not a "good" for purposes of the California Uniform Commercial Code (§§ 2105, 2315). (See *Pierce, supra,* 166 Cal.App.3d at p. 86, fn. 12.)