**In re PACIFIC GAS AND ELECTRIC COMPANY, Debtor.**

**Puget Sound Energy, Inc., Appellant,**

v.

**Pacific Gas and Electric Company, Appellee.**

**No. C–01–2451 MHP.**

United States District Court, N.D. California.

Jan. 4, 2002.

---

### MEMORANDUM AND ORDER

PATEL, Chief Judge.

On June 25, 2001, appellant Puget Sound Energy, Inc. ("Puget") filed an emergency motion for expedited appeal of the Bankruptcy Court's denial of Puget's Motion for Relief from Stay or Alternative Relief and Judgment Thereon, entered on June 20, 2001. On July 3, 2001, the court issued a revised expedited briefing sched-ule and the parties submitted briefs and voluminous supporting materials. On July 31, 2001, the court held a hearing on the matter. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

### BACKGROUND

In October 1991, Puget and Appellee Pacific Gas and Electric Company ("PG & E") entered into a Capacity and Energy Exchange Agreement ("Agreement") under which each party agreed to transmit 413,000 megawatts of energy to the other each year. *See* PG & E Exh. A. Puget was required to send electricity to PG & E between June and September each year and PG & E reciprocated between November and February. *Id.* at §§ 1.24, 1.31, 3.1, 3.2. The periods correlate with the respective recipient utility's peak demand season. The Agreement provides that the parties may request up to 300 megawatts per hour during the relevant four months. Id. at §§ 3.1, 3.2. The 413,000 total megawatts is calculated by calendar year. *Id.* at § 1.3. The electricity may be delivered either across the California–Oregon border, or across the Nevada–Oregon border at Malin, Oregon, "if and to the extent both parties have access to such point." *Id.* § 1.20.

Section 6.1 of the Agreement provides that either party may

> interrupt, suspend, curtail or allow fluctuation in any service under this Agreement, if such interruption, suspension, curtailment or fluctuation results from any of the following:
>
> . . .
>
> (e) actions taken in good faith by a Party to prevent, reduce or eliminate . . .
> (ii) unsatisfactory, or jeopardy to conti-

nuity of, electric service within that Party's service area.[1]

PG & E Exh. A § 6.1.

Section 6.2 of the Agreement states:

Except in cases of emergency or automatic actions, including the operation of automatic devices, each Party shall endeavor to give reasonable notice of any interruption, suspension, curtailment or fluctuation permitted by paragraph 6.1, and of its probable duration.

*Id.* § 6.2.

Section 6.3 of the Agreement provides: If any interruption, suspension, curtailment or fluctuation permitted by paragraph 6.1 causes ... a Delivering Party to deliver, or a Receiving Party to receive, less energy that the amount of energy to which the Receiving Party is otherwise entitled under this Agreement and has been scheduled in accordance with [the Agreement], the Delivering Party shall deliver to the Receiving Party at the Point of Delivery and the Receiving party shall accept delivery of an amount of energy equal to the difference as soon as is practicable thereafter as scheduled by the Receiving Party pursuant to [the Agreement].

*Id.* § 6.3.

Either party is permitted to unilaterally terminate the Agreement, but only after providing five years' notice. *See id.* § 2.2.

On December 18, 2000, PG & E filed an 8–K report with the New York Stock Exchange. *See* Puget Tr. Exh. 8. The report stated that Moody's and Standard & Poor's had both begun to scrutinize PG & E's securities for possible downgrades, citing "concerns about the escalating finan-

cial burdens placed on the Utility and the absence of short-term or long-term regulatory or statutory mechanisms for recovery of the under-collections [of revenues from consumers]." *Id.* at 4. PG & E also reported that "[a]lthough the Utility currently has approximately $1.2 billion of short-term investments, without obtaining additional financing, the Utility will be unable to continue paying its net power purchase costs. There is no assurance that the Utility will be able to obtain such additional financing." *Id.*

On January 10, 2001, PG & E filed an 8–K report announcing even more dire circumstances. PG & E reported:

The recent rate increase approved by the California Public Utilities Commission (CPUC) on January 4, 2001, will raise approximately $70 million in cash per month for three months. Even if all this cash were made available to the Utility immediately, $210 million represents approximately one week's worth of net power purchases at current prices. Thus, the rate increase does not raise enough cash for the Utility to pay its ongoing procurement bills or make further borrowing possible.

. . .

The utility currently is unable to borrow more money, and is foreclosed from the capital markets because of its financial condition. Absent immediate regulatory, legislative or judicial relief, the Utility will default on its payment obligations and faces the risk of being forced into bankruptcy.

Puget Tr. Exh. 10.

On January 11, 2001, the California Independent System Operator ("ISO"), the

---

1. Service area is defined as "that area within the exterior geographic boundaries of the several areas electrically served at retail, from time to time, by [a] Party. PG & E's Service Area is currently located in northern and cen-

tral California ...." PG & E Exh. A § 1.23. Neither party has presented any evidence that PG & E's service area has changed since the Agreement was entered into.

entity overseeing and regulating the entirety of California's power grid, declared a Stage Three Emergency from 8:50 A.M. until midnight. *See* Puget Tr. Exh. 37 at 9. The Stage Three declaration was only the second such occurrence ever. *See* Barrington Dec. ¶ 3.

A Stage 3 Emergency may be declared any time it is clear that a critical Operating Reserve shortfall (i.e., less than 1½ %) is unavoidable, or is forecast to occur within the next two hours. Stage 3 is the most severe Stage of Emergency and indicates that, without significant ISO intervention, the electric system is in danger of imminent collapse. Involuntary curtailment of service to consumers (i.e., "rolling blackouts") is required during a Stage 3 Emergency in amounts as needed to maintain Operating Reserve above 1½%.

ISO Alerts, Warnings, and Emergencies, February 1999, PG & E Exh. R at 6.

Jim McIntosh, Director of Grid Operations for the ISO and the person in charge of declaring Stage Three Emergencies, describes a system collapse as "voltage instability and blackout in the entire . . . WSSC [Western System Coordinating Council] region, which has 14 states and two provinces of Canada and Mexico . . . ." McIntosh Dep. at 7:22–8:5. One of the steps the ISO takes to avoid a system collapse is requesting utilities to curtail exports out of state. *See id.* at 8:19–24, 9:6–9; ISO Operating Procedure at 5, PG & E Exh. T.

Under the ISO's governing document, the Electric Tariff filed with the Federal Energy Regulatory Commission, "[i]n the event of a System Emergency, [utilities] shall comply with all directions from the ISO concerning the management and alleviation of the System Emergency and shall comply with all procedures concerning System Emergencies set out in the ISO Protocols." PG & E Exh. Z § 4.4.1. "The ISO shall have the authority to direct a [utility] to disconnect Load from the ISO Controlled Grid if necessary to avoid an anticipated System Emergency or to regain operational control over the ISO Controlled Grid during an actual System Emergency." *Id.* § 4.4.4.

On January 11, 2001, PG & E failed to send Puget 1,000 megawatts of power scheduled for delivery between 5 P.M. and 9 P.M. *See* Puget Tr. Exh. 16. PG & E appears to have informed Puget around 3 P.M. that it was cutting the schedule from 5 P.M. to 6 P.M. by 150 megawatts. That amount was subsequently adjusted by PG & E and Puget to a cut of only 100 megawatts. *See* Hidalgo Dep., Exh. 1 at 3–7. PG & E informed Puget of the balance of the cuts at approximately 5 P.M. *See* Puget Tr. Exh. 41 at 3.

On January 12, 2001, the ISO again declared a Stage Three Emergency from 12:17 A.M. until 3 A.M. For the next three days, California was spared a Stage Three declaration. However, on January 16, 2001, the emergency was resounded anew, this time from 7:20 A.M. until midnight. The next day, another emergency was declared at 1:45 A.M. The Stage Three Emergency continued unabated from that day, January 17, 2001, until February 17, 2001, when the ISO finally downgraded from an Emergency to a Stage Two Warning.[2] For the balance of February, the ISO managed to avoid any further Stage Three Emergencies. *See* Barrington Dec. ¶ 4; Puget Tr. Exh. 38.

On January 12, 2001, just after midnight, PG & E decided to curtail Puget

---

**2.** Stage Two Warnings are issued when actual or anticipated Operating Reserves are less than or equal to five percent. *See* ISO Alerts, Warnings, and Emergencies (February 1999), PG & E Exh. R.

from 300 megawatts to zero between 6 A.M. and 10 A.M. *See* Puget Tr. Exh. 41 at 3. However, when the ISO cancelled the Stage Three Emergency at 3 A.M., PG & E restored the original schedule; no cuts to Puget were actually made that day. *See* Puget Tr. Exh. 16.

On January 16, 2001, PG & E cut Puget entirely from 8 A.M. until 11 A.M., a total of 900 megawatts. *Id.*

On January 17, 2001, PG & E curtailed Puget for fourteen hours, cutting 300 megawatts of electricity an hour from 6 A.M. to 11 A.M. and then from 12 P.M. to 9 P.M. *Id.* That same day, in another 8–K report, PG & E stated that Standard & Poor's had downgraded PG & E's credit rating. *See* Puget Tr. Exh. 11 at 1–2. PG & E further reported that banks had refused its borrowing request and that the utility had failed to pay $33 million in maturing commercial paper. *Id.* at 3.

On January 17, 2001, Puget sent PG & E a letter stating:

> PG & E has failed to deliver energy as scheduled by Puget under the Agreement (for example on January 11, 16 and 17, 2001). Moreover, PG & E has not provided reasonable advance notice that it would not deliver energy as scheduled. PG & E has breached its obligations under the Agreement. PG & E has stated that it interrupted deliveries to maintain its reserves. This is not [a] reason for which Section 6.1 of the Agreement permits interruption[.] PG & E's failure to perform in accordance with the Agreement has caused, and continues to cause, substantial harm and damages to Puget.
>
> PG & E's repeated failures to deliver energy as scheduled by Puget were never contemplated by the parties and have deprived Puget of material and substantial benefits under the Agreement.

> Puget hereby demands that PG & E comply with the Agreement.
>
> Particularly in view of the downgrading of PG & E's debt rating to below investment grade and PG & E's financial position as disclosed in its 8–K filed last week, Puget also hereby demands that PG & E promptly provide Puget with reasonable and adequate assurance of PG & E's ability to perform the Agreement.

Puget Tr. Exh. 17.

On January 23, 2001, PG & E responded in writing, stating:

> PG & E has fully complied with the terms of the Agreement. In a lengthy discussion with Puget, PG & E explained that the reason that the curtailments were being invoked was due to a Stage 3 emergency and that, in PG & E's opinion, there was significant jeopardy to the continuity of electric service within the PG & E service territory. In fact, rolling blackouts were called on January 17 and 18. This fully meets the Agreement's Section 6.1e which states that curtailments can be called if they are:
>
>> "actions taken in good faith by a Party to prevent, reduce or eliminate (i) hazard to life or property or (ii) unsatisfactory, or jeopardy to continuity of, electric service within that Party's Service Area."
>
> Additionally, PG & E has provided as reasonable advance notice of these curtailments as has been possible. As stated in Section 6.2:
>
>> "Except in cases of emergency or automatic actions, including the operation of automatic devices, each Party shall endeavor to give reasonable notice of any interruption, suspension, curtailment or fluctuation permitted by paragraph 6.1, and of its probable duration."

As you may know, PG & E has faced continuing emergency conditions, some of which have been abruptly identified and required extremely quick responses. These emergency situations have, in some circumstances, required very short notice. PG & E has, however, made every attempt to provide as much notice as possible. While we are in these emergency conditions we will continue to make every attempt to provide as much advance notice as possible if curtailments are necessary.

In summary, PG & E has fully complied and will continue to fully comply with the terms of the Agreement. PG & E hopes that the current emergency conditions will soon abate but will take actions necessary to avoid seriously jeopardizing continuity of electric service.

Puget Tr. Exh. 18.

During the days between the two letters and for at least some period for seven of the eight days after the letter exchange, PG & E cut power deliveries to Puget, often for upwards of 16 straight hours scheduled for 300 megawatts per hour.[3] Frequently, Puget's schedule was cut to zero. *See* Puget Tr. Exh. 16.

On January 31, 2001, PG & E informed the ISO that it would no longer cut Puget unless the ISO were going to order it to cut firm customers as well. *See* Greif Dec. ¶ 32–33; Barrington Dec. ¶ 22. PG & E did not curtail power delivery to Puget again until February 14, 2001, when PG & E failed to send 900 megawatts of power between 9 A.M. and noon. *Id.* In all, during January and February PG & E failed to deliver a total of 52,000 megawatts, approximately 21% of the power Puget requested and PG & E scheduled under the Agreement. *See* Puget Tr. Exh. 22.

During this period, in addition to curtailing Puget, PG & E also cut so-called non-firm customers. *See* Barrington Dec. ¶ 19. Non-firm customers are provided reduced electricity rates in exchange for power cuts in time of need. *Id.* PG & E cut non-firm customers when the ISO issued a Stage Two Warning. *See* Greif Dep. at 59:10–12, 60:8–9. Puget was only cut during Stage Three Emergencies, i.e., after PG & E had already cut non-firm customers. *Id.* at 59:18–20. By January 22, 2001, PG & E had exhausted all contractual rights to cut non-firm customers. *See* McIntosh Dep. at 14:7–12.

On March 20, 2001, Puget filed an action in the Western District of Washington against PG & E, seeking the termination of the Agreement and damages for breach of contract. On April 6, 2001, PG & E filed for bankruptcy. As a consequence of the filing, the Washington action was stayed. Puget responded by filing a motion for relief from the stay or in the alternative adequate assurance or protection. On June 1, 2001, Judge Montali of the Bankruptcy Court issued an oral ruling denying the motion and ordering PG & E to determine by July 1, 2001 whether it would assume the Agreement. Judge Montali issued a written order to the same effect on June 20, 2001. On June 25, 2001, Puget filed this Emergency Motion for Expedited Appeal. On June 28, 2001, PG & E assumed the Agreement.

*LEGAL STANDARD*

 The court will review the bankruptcy court's legal conclusions de novo and its factual determinations for clear error. *See In re First T.D. & Inv., Inc.,* 253 F.3d 520, 2001 WL 682440, *3 (9th Cir.2001); *In re Chang,* 163 F.3d 1138, 1140 (9th Cir.1998); Federal Rule of Bankruptcy Procedure 8013 ("Findings of fact,

---

**3.** January 28, 2001 was the lone day without cuts.

whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). Mixed questions of law and fact are reviewed de novo. *In re Chang*, 163 F.3d at 1140. "A mixed question of law and fact exists when there is no dispute as to the facts, the rule of law is undisputed, and the question is whether the facts satisfy the legal rule." *Diamond v. City of Taft*, 215 F.3d 1052, 1055 (9th Cir.2000).

## DISCUSSION

Puget has two major contentions in its appeal. First, it argues that by failing to deliver power as scheduled in January and February, PG & E materially breached the Agreement. Second, Puget proffers that even if there was not a material breach, Puget reasonably demanded from PG & E timely adequate assurances under the Uniform Commercial Code ("U.C.C.") that PG & E could perform its contractual duties, particularly given PG & E's deteriorating finances. Puget contends that PG & E failed to respond adequately as PG & E never provided an answer regarding its finances. As such, Puget claims PG & E repudiated the Agreement, providing Puget the right to terminate the Agreement, which it purportedly did by filing its action on March 20, 2001.

PG & E responds that it did not breach the Agreement, because under Section 6.1 of the Agreement, emergencies excuse failure to deliver power. PG & E also contends that the U.C.C. does not apply to the Agreement as electricity is not a good and therefore Puget did not have the right to demand assurances. Even if it did have such a right, PG & E claims it did provide a timely assurance, both through its letter of January 23, 2001 and through its continuing to send power to Puget through the end of February, albeit with some curtailments. PG & E further contends that by continuing to demand and accept power after sending the letter of January 17, 2001, Puget waived its right to repudiate the Agreement for lack of adequate assurance.

## I. *Material Breach of the Agreement*

■ There is no dispute as to the law governing whether there was a breach, nor is there a dispute as to the fact that PG & E failed to deliver scheduled power. The question is whether that failure was a breach of the contract; i.e., whether the facts satisfy the legal rule. This is a mixed question of law and fact and therefore the court will review the Bankruptcy Court's findings de novo.[4]

The Bankruptcy Court found that:

Debtor's curtailment of Puget's receipt of power was protected in its entirety by the provisions of Section 6.1(e) of the exchange agreement in that debtor acted in good faith to prevent, reduce, or eliminate unsatisfactory or jeopardy to the continuity of electric service within its own service area. Accordingly, there was no pre-petition material breach. I also reject Puget's arguments that as an alternative PG & E repudiated the exchange agreement.

Tr. June 1, 2001 at 42:15–21.

Noting that the ISO "declared Stage Three Emergencies on each of the curtailment days," Tr. at 47:2–3, the Bankruptcy

---

4. In making this and all other determinations, the court will not consider the post-trial declarations of Greif and McIntosh submitted by PG & E. The Bankruptcy Court did not consider them for they were not requested by the court, nor was leave sought for their filing. Therefore, they were not properly in evidence before the Bankruptcy Court and will not be considered part of the record for this appeal.

Court found that Joe Barrington, the head of real-time operations for PG & E, "request[ed] curtailment and service to Puget to avoid more drastic steps such as rolling blackouts ... in good faith and completely consistent with PG & E's rights under the exchange agreement. This is exactly what debtor and Puget bargained for and Puget cannot complain that its counter-party exercised the very right given to it in the contract." Tr. at 49:6–7, 49:11–16.

This court agrees fully. Section 6.1 of the Agreement states either party may suspend or curtail delivery of power due to "actions taken in good faith by a Party to prevent, reduce or eliminate unsatisfactory, or jeopardy to continuity of, electric service within that Party's service area." PG & E Exh. A § 6.1(e). That is precisely what PG & E did here. Review of transcripts of the conversations between PG & E and Puget and PG & E and the ISO, statements regarding those conversations and ISO press releases, demonstrates that PG & E curtailed Puget only on the days of Stage Three Emergencies and only in close consultation with the ISO. *See* PG & E Exh. F; PG & E Exh. BB; PG & E Exh. KKK; PG & E Exh. X; Hidalgo Dep., Exh. 1; McIntosh Dep., Exh. 1; Barrington Dec. ¶¶ 7–22; Greif Dec. ¶¶ 32, 33. Jim McIntosh, Director of Grid Operations for the ISO, stated in his deposition that he routinely asked PG & E to curtail power exports during January and February because the ISO wanted to keep generation in the state "[e]ssentially to prevent the blackouts later in the day." McIntosh Dep. at 15:17–16:1. McIntosh called or had one of his employees call PG & E on a number of occasions to request cuts. *Id.* at 18:15–19:18. If PG & E refused, ISO called back to urge a cut. *Id.* at 20:14–21:9. For instance, on one occasion McIntosh spoke with PG & E during a Stage Three Emergency after PG & E refused to cut Puget and "[e]ssentially reiterated that we requested exports to be curtailed. It hadn't happened yet, and wanted to know if PG & E wanted to be in the position where they were dumping their firm customers while they were exporting out of the state ...." McIntosh Dep. at 23:17–23. Given this situation, in which rolling blackouts were imminent or on-going, in which the ISO presented a stark choice to PG & E: curtail exports out of state or cut off residential customers, in which all cuts were made in consultation with the ISO, Barrington Dec. ¶ 11, PG & E surely acted in good faith in cutting scheduled power deliveries to Puget.[5]

## A. *Alternate Supply/Delivery Sources*

■ Even so, Puget argues that if circumstances in California barred the export of power from Northern California, PG & E should have either 1) routed power from Southern California through Nevada and on to Puget at the Oregon border; or 2) purchased power in the Northwest and had it shipped directly to Puget. The Bankruptcy Court rejected these options. The Bankruptcy Court stated: "[t]here is no proof that Puget had access to [the Nevada/Oregon border] point of delivery, but that is not important as Puget has not

5. At oral argument, Puget raised for the first time the contention that a Stage Three Emergency declaration by the ISO meant that there was a threat to continuity of service in most of California as a whole, but not necessarily in PG & E's service area. As this argument was not raised below, the court does not find it in any way dispositive. Even were the argument reviewable, it has no merit. A Stage Three Emergency means the entire ISO-controlled grid is in danger of imminent collapse. That grid obviously includes PG & E's service area. Jeopardy to the grid is jeopardy to PG & E's consumers; they are one and the same.

demonstrated that debtor acted other than in good faith in scheduling the delivery through Mallin [sic], Oregon." Tr. June 1, 2001 at 46:6–9. "Puget also contends that debtor could have purchased real-time replacement power in the Northwest to make up for the curtailment that occurred. If either party to the exchange agreement were required to purchase substitute power in real-time, then paragraph 6.1(e) would serve little or no purpose." Tr. at 50:6–11.

Puget repeatedly stresses its view that the Agreement was a so-called firm contract; therefore, PG & E was required to find an alternate source and should not have cut Puget unless PG & E was also cutting other firm customers. The Bankruptcy Court found that the Agreement "is neither a firm nor a non-firm contract. It is a hybrid between two utilities to exchange power. It is not a firm contract for the very reason that paragraph 6.1(e) contemplates, namely that the debtor may act in good faith to prevent, reduce, or eliminate unsatisfactory or jeopardy to continuity of electric service." Tr. at 48:14–19.

The Bankruptcy Court was correct. There is no authority for Puget's conclusion. The existence of Section 6.1 indicates the contrary; firm contracts generally have no provision for cuts in times of need. Nothing in the contract requires delivery of power during emergent circumstances. PG & E need not find an alternate source or delivery route. Indeed, section 6.3 of the Agreement clearly states that if power is curtailed due to jeopardy to continuity of service in a party's service area, that "the Delivering Party shall deliver to the Receiving Party at the Point of Delivery and the Receiving party shall accept delivery of an amount of energy equal to the difference as soon as is practicable thereafter ...." PG & E Exh. A § 6.3.

Furthermore, there is no provision for damages for failure to deliver as would be typical of a firm contract of this magnitude.

This conclusion is buttressed by McIntosh's statements that no power was available in the Northwest. See McIntosh Dep. at 28:13–16 ("ISO was trying to secure energy from the Northwest through this process and was told there was nothing available in the Northwest, otherwise we would have secured it."); id. at 29:6–17 (stating ISO would have objected to PG & E's purchase and delivery of power from the Northwest directly to Puget, even though that would not have reduced the amount of power in Northern California because "[i]f they were going to deliver to them then we would have wanted it in the control area"). Indeed, Puget has offered no evidence that electricity was even available in the Northwest for real-time delivery. The only evidence Puget presented were predictions that no "resource adequacy problems" would occur on certain days in the Northwest. See Puget Tr. Exh. 97.

McIntosh testified that the ISO would have similarly objected to the transfer of power between Southern California and Oregon via Nevada. See McIntosh Dep. at 60:7–10 ("Any export out of the control area would have been generation that we could have retained in the control area that was not going outside the area," no matter which route of transport was used). Given the circumstances, under the Agreement PG & E did not need to provide power from an alternate source.

B. *Adequate Notice*

█ Puget contends that PG & E failed to provide adequate notice of the impending cuts. A review of the transcripts of conversations between the parties makes clear that PG & E endeavored to let Puget know at the beginning of each day the plan

for the duration of the day. There were a few occasions, particularly during the first few days of Stage Three Emergencies in January, when PG & E gave less than two hour's notice of a cut. For example, from the transcripts of conversations between PG & E and Puget on January 17, 2001, it is clear there was a scramble for power, that communications were coming at a furious pace from the ISO and that several times an hour PG & E was alerting Puget of the status of power availability. For instance, at approximately 5:09 A.M. on that date, Puget was advised of cuts to occur at the hours of 7 and 8 A.M. *See* PG & E Exh. CCC at 1943. At approximately 7:18 A.M. PG & E gave Puget notice of a cut beginning at 9 A.M. "probably through 11". *Id.* at 1951. At 10:48 A.M. PG & E told Puget there would be a cut from the hours 12 to 24. *See* PG & E Exh. CCC at 1955. At 10:56 A.M. Puget stated it was objecting to the cut due to lack of "reasonable notice." *Id.* at 1946 (note pagination not in chronological order). When Puget called to protest the cut, PG & E informed Puget that it would be cut only until 9 P.M. *Id.* at 1955–56. Until approximately 9:00 P.M. the calls between PG & E and Puget continued as PG & E kept Puget apprised of the power supply situation. During these conversations there were discussions of reinstating or making up cut hours.

From the record, the court concludes that PG & E acted in good faith to inform Puget in a timely manner and those instances in which little notice was given appear to have been the result of very short notice from the ISO to PG & E, not PG & E's negligence or recalcitrance. On January 17, the ISO notified PG & E only at 5:12 A.M. that it wished to curtail exports to Puget from 6 to 7 AM. *See* Barrington Dec. ¶ 16. At 7:30 AM, the ISO requested curtailment beginning at 8 A.M. *Id.* At approximately 8:30 A.M., the ISO requested that Puget be cut for the 10 A.M. hour. *Id.* In each instance, Puget was then promptly informed. *Id.* That is all the Agreement requires. *See* PG & E Exh. A § 6.2 ("Except in cases of emergency or automatic actions, including the operation of automatic devices, each Party shall endeavor to give reasonable notice of any interruption, suspension, curtailment or fluctuation permitted by paragraph 6.1, and of its probable duration."). The Bankruptcy Court reached this same conclusion, *see* Tr. 51:17–52:2, and shall be affirmed.

The cuts PG & E made were permissible under Section 6.1(e) of the Agreement and therefore are excusable. A similar result must be reached regarding Puget's contention that PG & E did not need to make cuts to Puget as evidenced by the fact that starting at the end of January, and without informing Puget of a change, PG & E began to resist the ISO's requests to curtail Puget. PG & E explains that it was learning to deal with a crisis situation, a situation never before facing the utility, and changed its policy only when it became apparent that the ISO could often avoid rolling blackouts without cutting Puget and that other utilities were not complying with the ISO's requests to curtail exports. *See* Greif Dec. ¶¶ 32–33; Barrington Dec. ¶¶ 21–22. Puget has not presented any evidence of bad faith on PG & E's part. ISO Director of Grid Operations McIntosh clearly backs PG & E's arguments. The Bankruptcy Court correctly found that this "does not undermine the justifiable conduct in January." Tr. at 50:16–18.[6] PG & E did not materially breach the contract.

---

6. Puget also argues that PG & E used California market conditions as an excuse for nonperformance, citing *Kaiser–Francis Oil Co. v.*

*Producer's Gas Co.,* 870 F.2d 563, 568–69 (10th Cir.1989). However, the critical difference between *Kaiser* and the instant action is

## II. Provision of Adequate Assurances

Puget claims that PG & E failed to respond adequately to Puget's January 17, 2001 reasonable demand for assurances, particularly as PG & E did not mention at all its finances when it answered in writing on January 23, 2001.

■ Before the court decides whether adequate assurances were required or given, it must first decide what law should guide that determination. Puget claims that the Agreement is governed by the U.C.C. Both California and Washington have adopted provisions of the U.C.C. relating to adequate assurances.[7] Both statutes also provide that in appropriate circumstances the aggrieved party may treat the contract as breached and sue immediately for damages. *See* CAL. COM. CODE § 2610; WASH. REV. CODE § 62A.2–610.

However, the U.C.C. does not apply unless the contract in question is one for a sale of "goods." Goods are defined by both states as "all things . . . which are movable at the time of identification to the contract for sale." CAL. COM. CODE § 2105; WASH. REV. CODE § 62A.2–105. Courts around the nation have split as to whether or not electricity is a good. After examining a number of cases, the Bankruptcy Court stated:

These cases seem to hold that transformation from a service to a product occurs when raw power crosses from the utility's distribution system to the customer's meter. And so I am at a loss to know why the same rules wouldn't apply when a customer happens to be a utility and even though the power is much greater, it certainly contemplates some

---

the fact that in *Kaiser,* market conditions made the contract unprofitable for one of the parties and as a consequence, it decided to refuse to perform unless the contract was renegotiated. *See Kaiser,* 870 F.2d at 569. In fact, the Kaiser court found that "[t]he evidence is so one-sided on these points that no rational trier of fact could have found otherwise, even crediting . . . evidence [from party that refused to perform]." *Id.* at 569. PG & E never requested any renegotiation of the contract. The conditions of the market here were such that PG & E was unable to perform-rolling blackouts were either occurring or imminent—but the contract excused performance in that situation.

7. CAL. COM. CODE § 2609 provides that:

"(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return. (2) Between merchants the reasonableness of grounds for insecurity

and the adequacy of any assurance offered shall be determined according to commercial standards.... (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

WASH. REV. CODE § 62A.2–609 similarly provides that:

"(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.... (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.... (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

sort of a meter or some sort of a measuring device.

Tr. at 53:11–20.

The Bankruptcy Court therefore found itself inclined to conclude that the U.C.C. applies, though it decided it need not reach ultimate resolution of that question. This is an issue of law; therefore, the court will review the Bankruptcy Court's decision de novo.

The court here finds that the U.C.C. does apply. Many of the cases tackling this question stem from the products liability realm, but California courts have consistently found that electricity is a product or good. *See, e.g., Pierce v. Pacific Gas & Elec. Co.,* 166 Cal.App.3d 68, 82, 212 Cal. Rptr. 283 (Cal.Ct.App.1985) ("As the Supreme Court of Wisconsin aptly put it, 'The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.' ") (citing *Ransome v. Wisconsin Elec. Power Co.,* 87 Wis.2d 605, 610, 275 N.W.2d 641 (Wis.1979)); *Mancuso v. Southern California Edison Co.,* 232 Cal. App.3d 88, 100, 283 Cal.Rptr. 300 (Cal.Ct. App.1991) ("We also reject Edison's claim that electricity is solely service and not a product. This issue was put to rest in California by *Pierce* .... Electricity which has passed through the consumer's meter has been sold and delivered. It is in the stream of commerce. It has been marketed. Such a transaction constitutes the sale of a product ...."); *Baldwin–Lima–Hamilton Corp. v. Superior Court,* 208

Cal.App.2d 803, 819, 25 Cal.Rptr. 798 (Cal. Ct.App.1962) ("Electricity is a commodity which, like other goods, can be manufactured, transported and sold."). Courts in other states have similarly found that electricity is a good for purposes of the U.C.C. *See, e.g., Grant v. Southwestern Electric Power Co.,* 20 S.W.3d 764, 771 (Tex.App. 2000) ("The Texas Supreme Court has ruled that: 'Electricity is a commodity, which, like other goods, can be manufactured, transported and sold.' As the Houston Court of Appeals stated, 'While the distribution of the electricity through a system of towers, poles, and wires may well be considered a service, the electricity itself is a consumable product.' As such, the sale of electricity comes under the umbrella of the Uniform Commercial Code.") (citations omitted); *Helvey v. Wabash County REMC,* 151 Ind.App. 176, 179, 278 N.E.2d 608 (Ind.Ct.App.1972) (holding electricity is a good under the U.C.C. as "[i]t is necessary for goods to be (1) a thing; (2) existing; and (3) movable, with (2) and (3) existing simultaneously. We are of the opinion that electricity qualifies in each respect. Helve says it is not movable and in this respect we do not agree, if for no other reason than the monthly reminder from the electric company of how much current has passed through the meter. Logic would indicate that whatever can be measured in order to establish the price to be paid would be indicative of fulfilling both the existing and movable requirements of goods.").[8]

---

**8.** Furthermore, the California products liability cases have generally determined that electricity is a product, and by analogy, a good, only at the point at which "the electricity is actually in the 'stream of commerce,' and expected to be at marketable voltage. In most cases this will mean the electricity must be delivered to the customer's premises, to the point where it is metered, although the many variations in electrical systems prevent

our drawing a 'bright line' at a particular point." *Pierce v. Pacific Gas & Electric,* 166 Cal.App.3d 68, 84, 212 Cal.Rptr. 283 (Cal.Ct. App.1985); *see also Fong v. Pacific Gas & Electric,* 199 Cal.App.3d 30, 38, 245 Cal.Rptr. 436 (Cal.Ct.App.1988) ("[E]lectricity does not become a product once it is delivered to plaintiffs' premises, i.e., the moment the wires cross plaintiffs' property line. Instead, the test is whether the electricity has been me-

Simply put, electricity in this instance is a thing movable at the time of identification to the contract for sale. That is clearly demonstrated by the fact that the Agreement calls for the shipment of specific quantities of electricity. The electricity is moved through the power lines and the amounts are metered and therefore identifiable. The court will apply the U.C.C.

### A. Reasonable Grounds for Insecurity

▮ The question remains whether Puget properly invoked the U.C.C.'s protections. Whether in a specific case a buyer has reasonable grounds for insecuri-

ty is a question of fact. *See Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 568 (10th Cir.1989); *AMF, Inc. v. McDonald's Corp.,* 536 F.2d 1167, 1170 (7th Cir.1976).[9] Therefore, the court reviews for clear error the Bankruptcy Court's questioning but failure to definitively state whether grounds for insecurity did exist. *See* Tr. 55:1–8, 55:13–22. "Because the reasonableness of a party's insecurity is determined by commercial standards, there must be an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform." *Top of Iowa Cooperative v.*

---

tered.") (citation omitted). The electricity at issue here clearly meets that standard. It passed from PG & E's lines to Puget's, was metered, was available to Puget in a voltage marketable from one power company to another and was immediately usable by Puget. It would be a product for strict liability purposes. It is by extension a good. *Cf. Singer Co., Link Simulation Systems Div. v. Baltimore Gas and Elec. Co.,* 79 Md.App. 461, 558 A.2d 419, 424 (1989) (holding electricity would not be considered a good when "it has not yet been converted into a useable state of lower voltage by passing through a meter into a customer's home or place of business, [as it] is not the refined product that the customer intends to buy").

Even states that have held that electricity is a service not a good, such as New York, have permitted power purchasers to demand adequate assurances of performance, reasoning:

> This Court is now persuaded that the policies underlying the U.C.C. 2–609 counterpart should apply with similar cogency for the resolution of ... controversy [over an electricity supply contract].... We are convinced to take this prudent step because it puts commercial parties in these kinds of disputes at relatively arm's length equilibrium in terms of reliability and uniformity of governing legal rubrics. The availability of the doctrine may even provide an incentive and tool for parties to resolve their own differences, perhaps without the necessity of judicial intervention. Open, serious renegotiation of dramatic developments and changes in unusual contractual expectations and qualifying circumstances would

occur because of and with an eye to the doctrine's application.
> In theory, this U.C.C. relief valve recognizes that "the essential purpose of a contract between commercial [parties] is actual performance * * * and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain" (U.C.C. 2–609, Comment 1). In application, section 2–609 successfully implements the laudatory objectives of quieting the doubt a party fearing repudiation may have, mitigating the dilemma flowing from that doubt, and offering the nonbreaching party the opportunity to interpose timely action to deal with the unusual development.

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458, 468, 682 N.Y.S.2d 664, 705 N.E.2d 656 (N.Y.1998).

**9.** While courts have on occasion determined the existence of reasonable grounds for insecurity as a matter of law, those decisions came in cases of bad faith or unequivocal facts. *See, e.g., BAII Banking Corp. v. UPG, Inc.,* 985 F.2d 685, 703–04 (2nd Cir.1993) (deciding as matter of law that no reasonable grounds for insecurity existed when party demanding assurances affirmatively prevented performance of contract by ordering terminal masters to refuse delivery ship permission to dock); *Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 569–570 (10th Cir. 1989) (holding summary judgment was appropriate when evidence was unequivocal that party would not perform under current terms of contract but only after renegotiation of terms).

*Sime Farms, Inc.*, 608 N.W.2d 454, 466 (Iowa 2000).

As of January 17, 2001, the date Puget demanded assurances from PG & E, PG & E had failed to deliver scheduled power on three of the previous six days and had announced dire financial straits. However, it is not clear to the court that these conditions meet the standard for reasonable insecurity. The instances in which PG & E failed to deliver power were not breaches of the contract, but rather were contemplated and excused by the Agreement. Furthermore, after the letter from Puget, PG & E continued to perform and told Puget through the letter of January 23, 2001 that it would continue to do so. *See In re Beeche Systems Corp.*, 164 B.R. 12, 16–17 (N.D.N.Y.1994) (rejecting contention that reasonable insecurity existed when supplier had filed for bankruptcy within one week of executing contract because supplier had indeed met its contractual obligations to date and had never given any indication that it did not intend to honor future obligations). PG & E's announcement in its 8–K filings of impending bankruptcy and credit rating downgrades may very well have been reasonable grounds, as PG & E purchases a significant amount of its power, *see* Baliban Dec. ¶¶ 5–6; *Cf.* U.C.C. Comment 2–609(3) ("Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question."); *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 191 (5th Cir.1984) (holding company had reasonable grounds for insecurity after receiving information from reliable source that customer was no longer making mortgage payments but rather another company was). The court need not settle this dispute for it ultimately reaches the same result either way: PG & E did not repudiate the contract. Therefore, for the pur-poses of this inquiry, the court will assume Puget had an adequate basis for insecurity.

## B. *Demand for Assurances*

■ In its letter of January 17, 2001, Puget demanded assurances and called attention to PG & E's precarious financial situation. *See* Puget Tr. Exh. 17 ("Particularly in view of the downgrading of PG & E's debt rating to below investment grade and PG & E's financial position as disclosed in its 8–K filed last week, Puget also hereby demands that PG & E promptly provide Puget with reasonable and adequate assurance of PG & E's ability to perform the Agreement."). At the same time, the letter was silent as to any deadline by which PG & E must respond or whether Puget would withhold performance if PG & E did not respond adequately.

Considering the mixed question of law and fact as to whether the letter was an adequate demand for assurances, the Bankruptcy Court found that it was not. The court stated that "[t]he January 17th letter lacks specificity, did not mention anything about Puget's insecurity." Tr. 54:24–55:1. The court concluded that "the vagueness of the January 17th letter's final paragraph does not constitute a justified demand, the failure to respond to which should constitute a repudiation as Puget would have it." Tr. at 55:19–22. The court therefore found that "[w]hile debtor's response of January 23rd should perhaps have included a reply concerning financial matters, the fact is that it assured Puget that it could perform under the agreement and in fact it did perform under the agreement except ... the interruptions during the curtailment days that the Court has excused." Tr. at 54:8–13.

This court agrees. The U.C.C. "requires a clear demand so that all parties are aware that, absent assurances, the demanding party will withhold performance." *Alaska Pacific Trading Co. v. Eagon Forest Prod., Inc.*, 85 Wash.App. 354, 363, 933 P.2d 417 (Wash.Ct.App.1997). It is far from clear that a person reading the letter from Puget would have understood that the U.C.C. was being implicated. First of all, there was room for debate as to whether the U.C.C. even applied to the Agreement. Second, Barrington, who prepared PG & E's response, is not an attorney, though he did consult one in preparing PG & E's response. *See* Barrington Dep. at 28:17–29:16. There is no evidence that Barrington understood the letter to be implicating the U.C.C. The letter did not quote from the U.C.C., cite it, or otherwise call attention to it. Puget chose not to use the form letter available from West McKinney's Forms, Matthew Bender, Lexis, or other similar format. *See* 5 West's McKinney's Forms, U.C.C. § 2–609—Form 1B (1987); Lexstat Cal. U. Com.Code § 2609, Suggested Forms (2001). There is no evidence the U.C.C. arose frequently in the dealings between these companies.[10] Nor is there evidence that Barrington understood that if PG & E failed to respond to the letter that Puget would terminate the contract. The letter did not include any statement regarding the consequences of a failure to respond or provide a deadline by which to do so. Given the totality of these circumstances, the court finds that Puget's demand was not sufficiently clear. However, even if the U.C.C. had been properly invoked, the outcome would be the same, for PG & E provided an adequate response.

### C. *PG & E's Response*

"What constitutes 'adequate assurance' is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir.1985). "If the assurances he demands are more than 'adequate' and the other party refuses to accede to the excessive demands, the court may find that the demanding party was in breach or a repudiator." *Hope's Architectural Prod., Inc. v. Lundy's Const., Inc.*, 781 F.Supp. 711, 716 (D.Kan.1991) (citation omitted); *cf.* U.C.C. Comment 2–609(4) ("Where a buyer can make use of a defective delivery, a mere promise by a seller of good repute that he is giving the matter his attention and that the defect will not be repeated is normally sufficient.").

On January 23, 2001, PG & E responded clearly and concisely that it "has fully complied and will continue to fully comply with the terms of the Agreement. PG & E ... will take actions necessary to avoid seriously jeopardizing continuity of electric service." Puget Tr. Exh. 17. This was entirely legitimate, including the reference to possible future cuts. Section 6.1 permits such cuts and Puget cannot demand as an assurance of no future cuts, i.e., more than it is entitled to under the Agreement. *See United States v. Great Plains Gasification Assoc.*, 819 F.2d 831, 835 (8th Cir.1987). This court finds that the Bankruptcy Court did not err. Given the length of the relationship between Puget and PG & E, the fact that never before had California seen an energy shortage of this magnitude, the good

---

10. At the same time, Judge Montali pointed out that PG & E attorneys did cite the U.C.C. in another lawsuit before him not involving Puget as a defense to PG & E's actions. Tr. 57:1–15.

faith shown by PG & E, the provisions in the Agreement permitting just the type of curtailment PG & E undertook, and the fact that PG & E did not breach either before or after the letter of January 17, 2001, but rather sent power to Puget whenever the emergent situation in California permitted, even refusing to cut exports at times despite ISO requests to do so, the court finds PG & E adequately assured Puget that it would continue performing the contract. PG & E did not repudiate the Agreement by failing to give adequate assurances.

The court also notes that instead of taking immediate action after the expiration of the thirty-day window provided by the U.C.C. to respond to a demand for adequate assurances, Puget continued to demand and accept electricity from PG & E, and waited until after PG & E had completed its entire schedule of delivery, i.e., until after the end of February, before taking court action. Puget never announced that it would terminate the Agreement. *See* Barrington Dec. ¶ 30 ("To my knowledge, in January and February 2001, no one from Puget ever told anyone at PG & E that Puget was terminating the contract."); Greif Dec. ¶ 35 (same). While this may be permissible under the U.C.C., this opportunistic course of action, combined with the fact that in the last few years Puget has commissioned numerous studies demonstrating the financial losses it was incurring under the Agreement, and even drew up termination papers in December 2000, makes the court suspicious of Puget's motives. *See* PG & E Exhs. §§ , TTT, UUU, VVV, WWW, XXX, CCCC, DDDD. In fact, there is case law, with whose premise this court concurs, that delay of this type waives the right to terminate the contract. *See National Fuel Gas Distrib. v. TGX Corp.*, 1992 WL 170819, *9–*10 (W.D.N.Y.1992) (after right to terminate accrued due to lack of adequate assurances, continued performance under contract waives right to terminate if party fails to "supply some notification that it was reserving its rights to suspend performance because of the failure ... to supply adequate assurance of performance"). Either way, the outcome is the same: the Agreement remains an executory contract.[11]

---

11. Even if the U.C.C. does not apply, the court would reach the same conclusion as to adequate assurances. If the Restatement not the U.C.C. applies, the outcome is the same. Restatement section 251 was created to provide the same protections as the U.C.C. to parties to contracts of all types, not just for contracts involving the sale of goods. *See* Restatement (Second) of Contracts § 251 cmt. a (1981). Restatement section 251 states:
(1) Where reasonable grounds arise to believe that the obligor will commit a breach by nonperformance that would of itself give the obligee a claim for damages for total breach under [section] 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.
Restatement (Second) of Contracts § 251.
Neither California nor Washington courts have adopted Section 251. Even assuming they had, and that there were reasonable grounds for Puget to believe that PG & E would commit a sufficient breach by nonperformance (though the Restatement Comment states that the grounds for insecurity cannot "be based on events that occurred after [contract was entered into] but as to which [party] took the risk when [it] made the contract." *Id.* cmt. b, illus. 2c. Sections 6.1(e) and 6.3 clearly contemplate a scenario as what took place in California in January and February—Puget took the risk that jeopardy to continuity of service in PG & E's service area would require PG & E to suspend deliveries.) it is not clear that Puget properly demanded adequate assurances.

### III. *Denial of Motion to Lift Stay*

Puget contends the Bankruptcy Court erred in refusing to lift the stay of the Washington State proceedings because PG & E committed incurable historical defaults.

Under the Bankruptcy Code:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

 The decision to grant or deny relief from an automatic stay is committed to the sound discretion of the bankruptcy court; it is reviewed for abuse of discretion. *See In re Conejo Enterprises, Inc.,* 96 F.3d 346, 351 (9th Cir.1996). "Such decisions will be reversed if based on an erroneous conclusion of law or when the record contains no evidence on which [the trial court] rationally could have based that decision." *In re Windmill Farms, Inc.,* 841 F.2d 1467, 1472 (9th Cir.1988).

Furthermore, PG & E provided adequate assurances given the circumstances of this particular. Puget cannot treat PG & E's actions as a repudiation.

 There has been no default here. Therefore, there is no need for PG & E to cure anything. PG & E may assume the Agreement. The Bankruptcy Court reached this same conclusion, though a bit more generously, actually investigating whether the purported defaults were curable. Clearly under the contract they are; section 6.3 contemplates later delivery of curtailed power shipments. The Bankruptcy Court properly refused to lift the stay.

### IV. *Adequate Assurance Under Bankruptcy Code Section 366*

Puget contends that the Bankruptcy Court erred in failing to require a deposit or other security for adequate assurance of performance. Under the Bankruptcy Code, utilities are singled out for special protections. The code states:

[a] utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

11 U.S.C. § 366(b).

 The use of the word "may" in the second sentence clearly contemplates that the decision whether to order security lies within the discretion of the Bankruptcy Court. *See In re Caldor, Inc.—NY,* 199 B.R. 1, 3 (S.D.N.Y.1996) ("a Bankruptcy Court must be given reasonable discretion

Puget has failed to present any other common law basis on which it could demand adequate assurances and treat failure to provide them within a reasonable time as a repudiation.

to determine what constitutes 'adequate assurance' of payment for continuing service"; upholding Bankruptcy Court finding that no deposit or monetary security of any kind required when "(1) the Debtors have significant cash on hand and access to over $500 million in financing; (2) the Debtors pose significantly less risk than other customers of the Utilities; (3) the Utilities have a greater ability to monitor the financial strength of the Debtors; (4) the Debtors are solvent and are operating out of the proceeds of their operations; (5) the Debtors have a solid prepetition payment history; and (6) the Utilities generally had not required deposits from the Debtors in the past.").

The Bankruptcy Court held that:

The evidence submitted by Andrew J. Van Horn and Richard Patterson is largely unrebutted by Puget. The testimony of those two individuals leads the Court to find that there is a likelihood that debtor will be able to perform under the exchange agreement during the balance of 2001 and the first two months of 2002 and beyond and that its anticipated financial condition as well as the availability of resources support a finding of adequate assurance of future performance.

Tr. 57:25–58:9.

■ Puget has pointed to no evidence disputing the Bankruptcy Court's finding. While the Richard Patterson ("Patterson") analysis is admittedly somewhat rosy, Puget has failed to contradict it. Given PG & E's assets and generating capacity, and the forecasts for supply and demand in the California energy market as discussed in the declarations of Andrew Van Horn and Patterson, and the fact that PG & E stands to benefit greatly by continued performance of the contract, Van Horn Dec. ¶¶ 50–52 (approximate net value of performance of contract through February 2002 is $72 million), Puget already has adequate assurances that PG & E will perform. *Cf. In re Demp,* 22 B.R. 331, 332 (Bankr. E.D.Pa.1982) ("In such a case such [sic] as this, where the debtor has a history of prompt and complete payment, in addition to being completely current in the prepetition utility payments, a cash deposit would be unnecessary. The Court finds that both the debtor's past history and the post-petition remedies available to [utility] constitute adequate assurance that the debtor will continue to pay for services as billed. Section 366 of the Code does not prevent the utility from exercising any rights it may have in regard to post-petition defaults."). The Bankruptcy Court did not abuse its discretion.

## V. *Evidentiary Rulings*

■ The Bankruptcy Court sustained several objections by PG & E to declarations submitted by Puget. Puget now challenges those rulings regarding portions of declarations by Ronald Bailey, former Vice President of Power Systems at Puget, and Kenneth Finicle, Day Trader for Puget. Evidentiary rulings are reviewed for abuse of discretion. *See Kulas v. Flores,* 255 F.3d 780, 783 (9th Cir.2001). The court has reviewed the documents and the objections and finds that the court did not abuse its discretion in striking the materials. Even if the court had permitted them to be entered into the record, they do not appear material to the outcome. They certainly would not change this court's conclusion.

## CONCLUSION

For the foregoing reasons, the court hereby affirms the decision of the Bankruptcy Court.

AFFIRMED.